Estate of Earl W. Hamlin, Deceased, Helen B. Hamlin, Executrix v. Commissioner.
Estate of Earl W. Hamlin, Deceased v. Commissioner
Docket No. 20602.
United States Tax Court
1950 Tax Ct. Memo LEXIS 178; 9 T.C.M. (CCH) 477; T.C.M. (RIA) 50142; June 9, 1950
*178 1. During the taxable years 1942 and 1943 and during the short period January 1 to March 17, 1944 (date of death), Earl W. Hamlin, deceased, received certain sums of money from one W. F. McManus as "kickbacks" on commissions paid to him by the Hamlin Metal Products Company. Pursuant to the agreement between Hamlin and McManus to split the commissions, McManus reported and paid the tax on all commissions and Hamlin was to reimburse him for one-half of the taxes paid resulting from the reporting of all commissions as McManus' income. Of the amounts which Hamlin received in 1943, he returned to McManus $4,622 in December 1943 upon McManus' representation that he needed that much money to finish paying his estimated taxes for 1943. Hamlin did not return anything to McManus in the other years. Held, that petitioner is taxable on the "kickbacks" which Hamlin received in 1942 and in 1944 up to the time of his death and is taxable upon the amounts of the "kickbacks" which Hamlin received in 1943, less the $4,622 which he returned to McManus in that same year. 2. Upon the evidence, held, the amounts of $560 and $943.13 received in 1942 and 1943, respectively, by Hamlin from his employer *179 represent additional compensation rather than a reimbursement for traveling expenses incurred on business of his employer. 3. Upon the evidence, held, respondent properly disallowed the amounts $686of and $980 claimed as deductions for charitable contributions for the years 1942 and 1943, respectively. Edwin W. Brouse, Esq., and C. G. Rausch, C.P.A., 510 Metropolitan Bldg., Akron 8, O., for the petitioner. Lawrence R. Bloomenthal, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion This proceeding *180 involves deficiencies in income taxes of decedent Earl W. Hamlin, as follows: Year
Deficiency
1943
$14,492.83
Jan. 1, 1944 to March 17, 1944
(date of death)
508.03 The year 1942 is involved only because of the Current Tax Payment Act. The deficiencies result from numerous adjustments to decedent's net incomes for the years 1942, 1943 and from January 1 to March 17, 1944. The greater part of the deficiency results from respondent's determination that decedent received "kickbacks" on commissions which were not reported as income but were properly includible in income. In a statement attached to the deficiency notice respondent complained this adjustment for the year 1942, as follows: "(c) In 1942, the decedent received the amount of $4,032.08 from M. F. McManus, a manufacturer's agent, representing one-half of the commissions paid to that individual by the Hamlin Metal Products Company, which amount was not included in the decedent's income tax return for that year. It is held that the amount of $4,032.08 constitutes taxable income to the decedent for the year 1942 under the provisions of section 22 (a) of the Internal Revenue Code." *181 Similar adjustments for the year 1943 and for January 1 to March 17, 1944, were made in the respective amounts of $15,031.27 and $819.40. By appropriate assignments of error petitioner contested these and other adjustments. Many adjustments to which petitioner assigned errors were conceded in whole or in part and effect will be given thereto in a recomputation under Rule 50. This leaves for our consideration the following issues: 1. Did respondent err in determining that decedent received from M. F. McManus, a manufacturer's agent, one-half of the commissions paid to McManus by the Hamlin Metal Products Company during the calendar years 1942 and 1943 and from January 1 to March 17, 1944, and that the amounts so received which were not reported in decedent's income tax returns filed for the above-mentioned years were properly includible in income? 2. Did respondent err in determining that $560 received by Hamlin in 1942 and $943.13 received in 1943 are includible in Hamlin's income for those years on the ground that these amounts represented additional compensation rather than a reimbursement for traveling expenses incurred on business of his employer? 3. Did respondent err in *182 disallowing $686 and $980 claimed by decedent as deductions for charitable contributions for the years 1942 and 1943, respectively? Findings of Fact Issue 1 Petitioner is the estate of Earl W. Hamlin, deceased. Helen B. Hamlin is the duly appointed, qualified and acting executrix of the estate. The income tax returns of Earl W. Hamlin (hereinafter sometimes referred to as Hamlin) for the calendar years 1942 and 1943 and of Earl W. Hamlin, deceased, for the period from January 1 to March 17, 1944, were filed with the Collector of Internal Revenue for the 18th District of Ohio at Cleveland, Ohio. During the taxable years involved herein and until his death on March 17, 1944, Hamlin was president, general manager and sales manager of the Hamlin Metal Products Company of Akron, Ohio. Prior to organizing his own company in 1934, he was sales manager, secretary and treasurer of the Akron-Selle Company, Akron, Ohio. Both concerns were engaged in manufacturing metal stampings. Michael F. McManus (hereinafter called McManus), a resident of Detroit, Michigan, has been engaged in business as a manufacturer's representative for 27 or 28 years prior to the hearing of this proceeding. *183 Hamlin and McManus had known each other for at least 25 years before Hamlin's death. During the years 1926 and 1927 McManus represented the Akron-Selle Company of which Hamlin was secretary and treasurer, and sales manager. Pursuant to a verbal agreement between Hamlin and McManus, McManus issued checks during those years to Hamlin which represented 50 per cent of the five per cent commissions McManus received from Akron-Selle. After 1927, McManus severed connection with Akron-Selle and had no further dealings with Hamlin until 1942. In 1942, McManus learned that the War Department was seeking an additional source for the manufacture of a flexible gasoline hose nozzle. McManus believing that Hamlin Metal Products could manufacture this item, contacted Hamlin who came to Detroit for an interview with a civilian purchasing agent employed by the War Department, which interview resulted in a war contract for the manufacture of 750,000 flexible hose nozzles. Subsequent to the award of the contract to Hamlin Metal Products Company, Hamlin came to Detroit on a business trip and conferred with McManus. Hamlin and McManus agreed that McManus would pay over to Hamlin one-half of all his *184 commissions received; McManus would report and pay the income tax due on the entire commissions earned; and Hamlin would then reimburse McManus for one-half of such additional income tax as resulted from McManus' including the full amount in his own income. The first commission check of $7,350 was cashed by McManus on October 15, 1942. During the last week of October 1942, McManus went to Akron, Ohio, and paid over to Hamlin $3,675 representing his share of the $7,350 commissions. After the first division of commissions, subsequent commission checks were divided equally between Hamlin and McManus throughout 1942 and 1943 and up until a short time before Hamlin died. There was no fixed time and place when such divisions occurred. Depending upon the mutual convenience of the parties, the money sometimes was paid over to Hamlin in Detroit and sometimes in Akron. McManus cashed the commission checks received from the Hamlin Metal Products Company and one-half of the commission would be given to Hamlin. Each "kickback" occurred within a reasonable period of time - about a week or ten days after McManus received his commission checks. McManus did not always wait until Hamlin was in Detroit *185 before cashing a check from the Hamlin Metal Products Company as he sometimes had the money waiting in his safe deposit box. During the taxable years 1942, 1943 and 1944, McManus represented other accounts and was not dependent upon the Hamlin Metal Products Company for a living. The commissions split with Hamlin were from the only contract McManus had with Hamlin Metal Products Company and no sales effort was required to procure that contract for flexible hose nozzles. McManus included commissions received from the Hamlin Metal Products Company as taxable income in his returns, as follows: Year
Amount
1942
$ 7,878.96
1943
30,000.00
1944
2,915.68 He did not claim any deduction for the amounts paid to Earl W. Hamlin pursuant to their commission splitting arrangement. The full amount of tax due by reason of the inclusion as taxable income of the full amount of commissions received from the Hamlin Metal Products Company for the years 1942, 1943, and 1944, has been paid by McManus. The amounts which McManus reported as taxable income received from the Hamlin Metal Products Company were based on information furnished to him at the end of each year by that corporation *186 which he turned over to his own attorney for preparation of income tax returns. On or about December 15, 1943, McManus sent, or caused to be sent, to the Collector of Internal Revenue a declaration of his estimated income and victory tax for 1943. This declaration showed a balance of tax due in the amount of $11,690.24 and was accompanied by a check drawn by McManus on his account at the uptown branch of the National Bank of Detroit in the amount of $7,000. McManus did not pay the full amount shown to be due on the above-mentioned estimate of tax because he did not have sufficient funds on hand at that time. McManus then wrote to Hamlin at his home, 1200 Sunset View Boulevard, Akron, Ohio, and asked him to be good enough to meet his obligation, meaning that he wished Hamlin to reimburse him for a part of the tax burden he was assuming by reporting the full amount of commissions from the Hamlin Metal Products Company. No reply was received to this letter and after further correspondence McManus finally received a check #4307, dated December 20, 1943, drawn on the First Industrial Bank of Akron in the amount of $4,622, bearing two signatures, one of which was that of F. D. Spangenberg, *187 assistant treasurer. This check, in the amount of $4,622, was deposited by McManus in his account in the uptown branch of the National Bank of Detroit and was paid through the Detroit Clearing House on December 22, 1943. Immediately upon receiving Hamlin's check for $4,622, McManus issued his own check to the Collector of Internal Revenue dated December 21, 1943, in the amount of $4,690.24 in payment of the exact balance due on his estimated tax for 1943. Although the check received from Hamlin was less than the amount McManus had requested, he accepted it and paid the difference of $68.24 from his personal funds. No deduction for McManus' estimated tax liability was made when the 50 per cent portion of his commissions was turned over to Hamlin because they had agreed that reimbursement for such taxes would be made at a later date. The check for $4,622, dated December 20, 1943, was the only reimbursement received by McManus for the additional taxes assumed and paid by him during the entire course of his dealings with Hamlin from 1942 to 1944, inclusive. No statement of account was ever prepared by either man to show the amount of income taxes paid on Hamlin's half for which McManus *188 was entitled to reinbursement. In accordance with their agreement Hamlin was not going to pay any tax directly to the United States Government on the money he received as a split or "kickback" in commissions from McManus. The check for $4,622, payable to M. F. McManus, dated December 20, 1943, was not intended by Hamlin as a loan or gift to the payee, but was a partial reimbursement for taxes paid by McManus as a result of his reporting the entire amount of commissions as his income. Clarence G. Rausch, the accountant for Hamlin and the Hamlin Metal Products Company since 1935, did not know until 1946 that Hamlin had purchased the above-mentioned $4,622 check for cash in 1943. He first learned that fact when an examination of Hamlin's income tax returns for the years involved in this proceeding was commenced in 1946. Hamlin's books and records were so incomplete and unsatisfactory that it was impossible for the petitioner's own accountant to reconstruct clearly the source of all funds received and expended by Hamlin from January 1, 1942 to March 17, 1944, including the cash to purchase the $4,622 check. None of the papers or documents left by Hamlin showed that he was participating *189 in a split of commissions with McManus. Mrs. Hamlin did not find any documents or records among her husband's papers which would indicate that he owed McManus or that McManus was indebted to him. Prior to her husband's death, Mrs. Hamlin took no part in the operation of the Hamlin Metal Products Company. Petitioner's accountant made an exhaustive examination of all information available to him but was unable to ascertain that Hamlin had not received "kickbacks" from M. F. McManus. In 1945, McManus was required to pay to the United States Government $3,800 or $4,000 in connection with renegotiation proceedings instituted by the Navy Renegotiation Board. After McManus learned the amount he would have to repay pursuant to renegotiation proceedings, he wrote to Mrs. Hamlin explaining that he had been in business with her husband and requested her to send him $5,000 for "* * * your portion of the business." No specific mention was made of reimbursement for taxes borne by McManus on commissions split with Hamlin prior to his death, but this request for funds was intended to secure such reimbursement. McManus testified for the Government in the present proceeding in response to a subpoena *190 and was not offered any promise or reward, immunity, or other inducement for appearing as a witness, nor was he offered any benefit in connection with his own income tax returns for 1942 and 1943. Upon audit of the income tax returns of Earl W. Hamlin for the years 1942 and 1943, and the return of Earl W. Hamlin, deceased, for the period January 1 to March 17, 1944, the Commissioner determined that Hamlin had received the following amounts from McManus constituting his share of the commissions received by the latter according to the records of the Hamlin Metal Company: Year
Amount
1942
$ 4,032.08
1943
15,031.27
January 1 to March 17, 1944
819.40 This determination was made from the records of Hamlin Metal Products Company showing the amount of commissions paid to McManus. Some of these checks alleged to have been divided with Hamlin were not in fact divided. The following checks were divided with Hamlin in the years indicated: 1942
Check #
Date
Amount
20287
10-14-42
$ 7,350.00
20917
12-23-42
509.15
Total
$ 7,859.15
1943
21338
2-12-43
$ 5,192.70
21680
3-12-43
6,999.60
21988
4-17-43
7,380.92
22204
5-12-43
7,376.00
22426
6-14-43
2,027.37
Total
$28,976.59
1944
24386
2-18-44
$ 975.85
*191 Issue 2 Hamlin did not include in his gross income for 1942 the amount of $17,194.87 received from the Hamlin Metal Products Company and did not claim any deduction for the traveling and entertainment expenses for which he allegedly was being reimbursed. Upon audit of decedent's return for 1942, the Commissioner allowed the entire amount as a deductible expense with the exception of $560 which was disallowed as representing the personal expenses of Hamlin and his wife while on a vacation trip at White Sulphur Springs, Virginia. At the hearing counsel for petitioner conceded that one-half of this $560 item was properly disallowed as a personal expense. In 1942, Hamlin, accompanied by his wife, visited various locations in the southern part of the country in an attempt to locate new sources of supply for wooden handles for the shovels being made by the Hamlin Metal Products Company. They then stopped at White Sulphur Springs, Virginia, for a short rest. Hamlin did not transact any business for his employer while staying at White Sulphur Springs. Hamlin received $15,810.24 in 1943 from the Hamlin Metal Products Company which he did not include in his gross income and no deduction *192 was claimed for the traveling and entertainment expenses for which decedent allegedly was being reimbursed. Upon audit of Hamlin's 1943 return, the entire amount was allowed as a deductible expense with the exception of $943.13 representing one-half of the cost of expenses incurred by Hamlin and his wife on two visits to the Waldorf-Astoria Hotel in New York and vacation expenses for the couple at The Cloister, Sea Island, Georgia. Counsel for petitioner conceded at the hearing that the entire amount of $943.13 was properly disallowed. Issue 3 On his return for the year 1942, Hamlin claimed a deduction in the amount of $1,860.75 for contributions and upon audit of his return the Commissioner disallowed the following items as deductions in the total amount of $686; Dis-
Claimed
Allowed
allowed
Army Air Show
$ 165
0 $165
St. Thomas Hospital
50
0
50
Salvatorian Fathers
100
$ 89
11
Church
720
260
460
$1,035 $349 $686
Counsel for the petitioner admitted at the hearing that $165 of this total was properly disallowed as representing the purchase price of tickets to the Army Air Show for personal use of the decedent, his family *193 and friends. The item of $50 allegedly donated to St. Thomas Hospital was disallowed for lack of substantiation. Mrs. Hamlin claims that Hamlin gave a $50 bond to St. Thomas Hospital but was unable to state the time or place when such bond allegedly was donated or the cost thereof. No record of charitable contributions was kept by Hamlin for 1942. Mrs. Hamlin likewise made charitable contributions to their church and she filed separate income tax returns for 1942 and 1943. She does not know whether the donation of the bond was made in her name or her husband's name. The deduction of $100 in 1942 for a contribution to the Salvatorian Fathers was reduced to $89 because the Internal Revenue agent who conducted the audit was shown a canceled check for $89 or a letter from the Salvatorian Fathers stating that Hamlin had paid less than the amount shown on his return. The deduction of $720 for donations to St. Sebastian's Church was reduced to $260 because the employee of Rausch, the accountant representing the petitioner, who was assigned to assist in supplying the examiner with information stated that she was unable to secure any verification from the church to prove the contributions *194 claimed. The amount allowed represents $5.00 a week for 52 weeks. Mrs. Hamlin saw her husband place that amount in an envelope every Sunday, but claims he made additional contributions to purchase tickets, donated food, and gave larger amounts of money at Easter and Christmas; however, she has no personal knowledge of the actual sums allegedly given at Easter and Christmas. The examining agent never received any verification of the nature and amount of the charitable contributions disallowed for 1942 and 1943. Decedent claimed a deduction in his income tax return for 1943 for charitable contributions in the amount of $1,793.75. Upon audit of this return the Commissioner has disallowed $980 consisting of the following items: Dis-
Claimed
Allowed
allowed
St. Sebastian's
Church
$1,100 $260 $840
Army Relief
140
0
140
$1,240 $260 $980
The petitioner has conceded that the $140 item for Army Relief was properly disallowed in 1943. No record was kept by Hamlin of his charitable contributions for 1943 and no attempt was made by Mrs. Hamlin to obtain confirmation from St. Sebastian's Church of the amounts allegedly donated to it during *195 1942 and 1943. The amount allowed represents $5.00 a week for 52 weeks. Opinion BLACK, Judge: Under the first issue, upon which the greater part of the deficiency rests, it is necessary for us to determine whether Hamlin received one-half or a lesser amount of certain commissions paid to McManus by the Hamlin Metal Products Company during the taxable periods herein. There is no dispute between the parties that these "kickbacks" if received by Hamlin constitute taxable income under section 22(a) of the Internal Revenue Code. Petitioner contends that Hamlin never received any "kickbacks" from McManus while respondent contends he did. Hamlin being dead, petitioner could offer no proof that such an arrangement did not exist nor could petitioner prove by any positive evidence that Hamlin did not receive one-half of the commissions paid to McManus by the Hamlin Metal Products Company. Clarence Rausch, a certified public accountant who had been the accountant for Hamlin and the Hamlin Metal Products Company since 1935, was never informed by Hamlin of any agreement to divide commissions with McManus. Rausch could not find any evidence of such an agreement from a *196 search of Hamlin's records after his death, nor was he able to reconstruct Hamlin's books to properly reflect all of the income items. Without relying on the presumption of correctness given the deficiency notice, respondent introduced evidence to show that Hamlin received commission splits from McManus. As corroborative evidence of commission "kickbacks" during the taxable periods, respondent introduced in evidence nine checks aggregating $4,800 which were signed by McManus and endorsed by Hamlin. These checks dated in 1926 and 1927 were payments pursuant to an oral agreement to divide one-half of McManus' commissions from the Akron-Selle Company of which Hamlin was then secretary-treasurer and sales manager. After 1927 McManus severed his business connections with Akron-Selle and had no further business dealings with Hamlin until 1942. During this period from 1927 to 1942, McManus and Hamlin remained good friends. The alleged payments to Hamlin during the taxable periods herein represent one-half of the commissions received by McManus from the Hamlin Metal Products Company on a war contract procured in 1942 by McManus with no sales effort on his part. In 1942, after the contract *197 had been awarded to the Hamlin Metal Products Company, Hamlin met McManus in Detroit and discussed the probable commissions. On a piece of paper, introduced in evidence, Hamlin wrote down an arbitrary figure of $7,500, took one-half, leaving $3,750, and then deducted $2,250 from the $3,750, leaving a net of $1,500. This paper does not bear Hamlin's signature but McManus testified Hamlin wrote it. McManus testified that this memorandum evidenced their understanding that he would pay one-half of his commissions to Hamlin but that he would report the full amount as taxable income, pay the taxes due, and secure reimbursement later from Hamlin for one-half of the tax paid as a result of reporting the full amount of the commissions. McManus explained that the $7,500 figure represented Hamlin's estimate of the first advance commissions, that McManus' tax was computed at a 60 per cent surtax rate, and that one-half of the resulting tax, or $2,250, was deducted by Hamlin from his share leaving him a net of $1,500. The first check for advances on commissions received by McManus was for $7,350. McManus visited Hamlin's home during the last week in October 1942, and he testified that in the *198 presence of Mrs. Hamlin he turned over one-half of this check to Hamlin which Hamlin needed for his daughter's approaching wedding. Hamlin's daughter was married on November 21, 1942, and McManus attended the wedding. Mrs. Hamlin denied having seen any money transferred to Hamlin at the time of McManus' visit in October. The exact dates of later divisions of commissions are not given, but approximately 10 days elapsed between the receipt of a check and its subsequent division. No records were kept by McManus on the division of commissions, therefore, considerable examination and cross-examination were required to determine exactly which checks were divided with Hamlin. The truth of McManus' testimony as to the agreement and actual split of commissions is borne out by corroborating evidence which is a check dated December 20, 1943, in the amount of $4,622 purchased by Hamlin from the First Industrial Bank of Akron, Ohio, payable to McManus. In December 1943, when the balance of $11,690.24 on McManus' estimated income tax for 1943 became due and payable, McManus was short of funds. On or before December 15, 1943, McManus sent his final estimate for 1943 to the Collector of Detroit *199 and accompanied it with his check for $7,000. McManus received the $4,622 check from Hamlin on December 21, deposited it in his account, and then sent the collector his own check for $4,690.24, dated December 21, 1943, in payment of the balance due on his December 15 estimate, making up the difference of $68.24 from his own funds. Petitioner attempted to show that the check for $4,622 was connected with the purchase of a diamond bracelet Hamlin gave his wife for a Christmas present in 1943. No evidence was introduced to prove the connection between the check and the bracelet. There is nothing in the record to suggest that McManus was a party to the purchase of the bracelet and there is no evidence as to the actual cost of the bracelet. The jeweler from whom petitioner claimed the bracelet was purchased did not testify at the hearing. We are convinced that the $4,622 in question was a reimbursement to McManus for a portion of the taxes paid by him as a result of his reporting the entire commissions. The $4,622 was the only amount shown to have been returned by Hamlin to McManus. From all the evidence we conclude that Hamlin received "kickbacks" from McManus during the taxable years *200 herein. The amounts received by Hamlin were one-half of the checks found to have been divided, which checks and amounts are set out in our findings of fact. The $4,622 which Hamlin returned to McManus in 1943 is also set out in our findings. After having determined that Hamlin received certain sums as commission splits during the taxable periods, we think that it is necessary to decide how the $4,622 returned by Hamlin to McManus in 1943 should be treated. Respondent contends that the gross amount of commissions received by Hamlin, unreduced by the $4,622, should be included in Hamlin's income. Petitioner makes no suggestion as to how the $4,622 should be treated. We think the $4,622 should not be taxed to petitioner. Petitioner is not making any claim that its own income tax for 1943 should be credited with this $4,622. If it were claiming such a credit it could not be allowed because one taxpayer cannot be allowed a credit on his own income tax for any part of the tax which he pays for another taxpayer. Cf. Charles v. Parker, 17 B.T.A. 608 and J. C. Wynne, et al., Trustees v. Commissioner, 77 Fed. (2d) 473 affirming 28 B.T.A. 125. Nor is *201 petitioner claiming any deduction of $4,622 from its own income as income tax which it paid for McManus. We do not know what McManus' income tax liabilities were for 1942, 1943 and 1944; we do not have him before us as a taxpayer in this proceeding. What petitioner is claiming is that Hamlin did not receive any "kickbacks" at all from McManus in any of the taxable years and did not return anything to McManus. After a careful examination of the evidence, we have found against petitioner on that claim and have found that Hamlin did in fact receive "kickbacks" from McManus and that he did return to McManus in 1943, $4,622 as described in our findings of fact. We have found that checks aggregating $22,976.59 from Hamlin Metal Products Company to McManus were divided with Hamlin in 1943. If Hamlin had kept one-half of this amount it would have been $14,488.30 and he would have been taxable on that amount. However, he did not retain all this amount but returned $4,622 of it before the end of the year. Thus of the $14,488.30 which he first received from McManus, he retained only $9,866.30 and returned the balance to McManus. We held that petitioner is taxable only on this $9,866.30 which *202 Hamlin retained in 1943 and is not taxable on the $4,622 which he returned to McManus. Cf. Horace Mill, 5 T.C. 691. Under the second issue it is necessary to decide whether respondent erred in increasing Hamlin's income for 1942 and 1943 by the respective amounts of $560 and $943.13 on the grounds that these amounts represented additional compensation rather than a reimbursement for traveling expenses incurred on business of his employer. As set out in our findings of fact, petitioner conceded that respondent did not err as to the $943.13 received in 1943. Petitioner does contend, however, that one-half of the $560 received in 1942 is a deductible expense. The $560 represents the cost of Hamlin's and his wife's visit at White Sulphur Springs, Virginia. Petitioner conceded that $280 does not represent a deductible expense as that amount was spent on Mrs. Hamlin's visit. Mrs. Hamlin testified that no business was transacted at White Sulphur Springs and petitioner offered no evidence to substantiate its claim that $280 represented a business expense. J. N. Flowers v. Commissioner, 326 U.S. 465. See also Regulations 111, section 29.23 (a)-2 (c). We conclude *203 that respondent did not err in determining that $560 and $943.13 received in 1942 and 1943, respectively, represent additional compensation. Under the third issue we must determine whether respondent erred in disallowing $686 and $890 as deductions for contributions to church and charity in the years 1942 and 1943, respectively. The petitioner has conceded that $165 for 1942 and $140 for 1943 out of the amounts so disallowed by the Commissioner are not deductible as charitable contributions for the respective years. The remainder of the disallowed items which the petitioner contends should have been allowed by the Commissioner are as follows: Dis-
Claimed
Allowed
allowed
1942 St. Thomas
Hospital
$ 50 $0
$ 50
1942 Salvatorian
Fathers
100
89
11
1942 Church
720
260
460
1943 St. Sebastian's
Church
1,100
260
840 All of these disallowances were based on a lack of verification as required by the Commissioner's regulations issued in accordance with the provisions of section 23 (o) of the Internal Revenue Code. Hamlin kept no record of his charitable contributions. Mrs. Hamlin claimed that the $50 donated to St. *204 Thomas Hospital represented a gift of a $50 bond; however, she was unable to state the time or place of the alleged donation and the cost thereof. Mrs. Hamlin, who also contributed to the church and filed separate income tax returns for 1942 and 1943, did not know whether the alleged donation to St. Thomas Hospital was in her name or in her husband's name. Petitioner failed to sustain its burden of proof on this item. The $100 claimed contribution to the Salvatorian Fathers in 1942 was reduced to $89 by the agent because a canceled check or letter from the Salvatorian Fathers showed that $89 was the amount actually paid by Hamlin. No evidence was offered by petitioner to overcome the agent's testimony and, therefore, respondent properly disallowed $11 on this item. Hamlin's returns claimed contributions to St. Sebastian's Church of $720 and $1,100 in 1942 and 1943, respectively. Respondent allowed $260 per year or $5.00 per week as donations. This $5.00 per week allowance is in accordance with Mrs. Hamlin's testimony that she saw Hamlin place that amount in an envelope every Sunday. Mrs. Hamlin claims that the decedent made additional contributions to the church to purchase bazaar *205 tickets, that he donated food for various parties and gave large amounts of money at Easter and Christmas. However, she has no personal knowledge of the actual sums allegedly given at the holiday seasons and she has never made any inquiry of the church to verify such alleged donations. Mrs. Hamlin testified that she would rather have the item disallowed than be forced to inquire of the church as to the amounts of Hamlin's contributions. We feel that respondent has made an adequate allowance for these contributions which were unsubstantiated and, therefore, respondent properly disallowed the amounts of $460 and $840 for the years 1942 and 1943, respectively. On this issue respondent is sustained. Decision will be entered under Rule 50.